

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE  JUN 1 3 2019
~Fairhurst, CJ
CHIEF JUSTICE

This opinion was
filed for record
at 8 am on 6-13-19

~Susan L. Carlson~
Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CESAR BELTRAN-SERRANO, an incapacitated person, individually, and BIANCA BELTRAN as guardian ad litem of the person and estate of CESAR BELTRAN-SERRANO, <br><br>                  Petitioners, <br><br>     v. <br><br> CITY OF TACOMA, a political subdivision of the State of Washington, <br><br>                Respondent. | NO. 95062-8 <br><br><br> EN BANC <br><br><br> Filed    **JUN 1 3 2019** |

STEPHENS, J.—Cesar Beltran-Serrano, a mentally ill homeless man, was shot multiple times by Tacoma Police Officer Michel Volk, after a simple social contact escalated to the use of deadly force. Beltran-Serrano survived the shooting and, through a guardian ad litem, brought this action for negligence and assault and battery against the city of Tacoma (City). The Pierce County Superior Court dismissed the negligence claims on summary judgment, agreeing with the City that the sole avenue for any recovery must be an intentional tort claim for assault and battery.

We reverse. The fact that Officer Volk's conduct may constitute assault and battery does not preclude a negligence claim premised on her alleged failure to use ordinary care to avoid unreasonably escalating the encounter to the use of deadly force. Under well-established negligence principles, police officers owe a duty of reasonable care in situations such as this. Beltran-Serrano has presented evidence to allow a jury to find that the City failed to follow accepted practices in Officer Volk's interactions with him leading up to the shooting and that this negligence resulted in his injuries.

## FACTS AND PROCEDURAL HISTORY[1]

Beltran-Serrano suffers from mental illness and has limited English language proficiency. On June 29, 2013, he was homeless when Officer Volk noticed him standing on the corner of East 28th Street, an area of Tacoma where the police had received multiple complaints about panhandlers. Officer Volk parked her patrol vehicle near Beltran-Serrano and approached him with the goal of educating him about the City's panhandling laws. She did not have reasonable suspicion or probable cause to believe he was committing a crime.

---

[1] Because we are reviewing an order granting summary judgment, we consider all facts and reasonable inferences in the light most favorable to Beltran-Serrano, the nonmoving party. *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 784, 30 P.3d 1261 (2001) (plurality opinion). Our review is de novo. *Id.*

As Officer Volk approached Beltran-Serrano, he laid down on his stomach and started digging in a hole. Officer Volk greeted Beltran-Serrano, but he looked up at her blankly and kept digging in the hole. Noticing that the hole contained mainly garbage, Officer Volk observed Beltran-Serrano pull out an old soda container, take a drink, and throw it back in the hole. When Officer Volk asked Beltran-Serrano if he understood English, he shook his head no. Officer Volk then radioed for a Spanish-speaking officer. Officer Jake Gutierrez, who spoke Spanish, was within one and a half to five minutes away.

Instead of waiting for Officer Gutierrez to arrive, Officer Volk attempted to engage Beltran-Serrano in conversation; he was nonresponsive. She attempted to get Beltran-Serrano to produce identification, gesturing to indicate she wanted to see an ID card. Beltran-Serrano began to pat his pockets as if to look for identification, but then he bent down and reached back into the hole. When Officer Volk moved closer to Beltran-Serrano and continued to address him in English, he became scared and started to run away. Officer Volk shot him in the back with a stun gun as he ran across the street. Clerk's Papers (CP) at 400-01. The stun gun did not have the desired effect, and Beltran-Serrano continued to run away. *Id.* Officer Volk then pulled out her duty weapon and fired multiple shots until Beltran-Serrano fell to the

ground. CP at 401. The total time between when Officer Volk called for a Spanish-speaking officer and the shooting was 37 seconds. CP at 396.[2]

In resisting summary judgment, Beltran-Serrano offered declaration testimony from multiple witnesses who stated that they did not see Beltran-Serrano assault Officer Volk or brandish any weapon and that there was no instance of struggle or altercation on the street corner. Witnesses expressed concern as to why Beltran-Serrano was shot because he did not appear to be acting aggressively or making threatening motions. CP at 415-16, 432-33. A shooting scene reconstruction led a ballistics expert to conclude that "[n]one of the fired bullet paths to Beltran-Serrano support him 'swinging' or otherwise moving his arms at the time of receiving the gunshots." CP at 459.

Through a guardian ad litem, Beltran-Serrano brought this action against the City. In addition to a claim for assault and battery, his complaint alleged that Officer Volk improperly, unreasonably, and unnecessarily escalated the situation, and that

---

[2] The City offers a different view of the facts. According to Officer Volk's statement, after Beltran-Serrano reached back into the hole, he grabbed what appeared to be a piece of construction pipe that was bent into an oval shape. CP at 365. Beltran-Serrano swung the object at Officer Volk's upper body, and she blocked the strike with her left forearm before giving chase to Beltran-Serrano as he ran into the street. *Id.* As Beltran-Serrano was running away, Officer Volk discharged her stun gun, hitting Beltran-Serrano in the back, at a distance of approximately seven yards. CP at 366. After the stun gun appeared to have no effect, Officer Volk maintains that Beltran-Serrano turned toward her, raised the object above his head as if to strike, and began to move in her direction. *Id.* Officer Volk then drew her firearm and fired until Beltran-Serrano "dropped the pipe and fell to the ground." *Id.*

the City failed to properly train and supervise officers to deal with the mentally ill and to exercise appropriate force. CP at 77. The City filed a motion for partial summary judgment, arguing it owed no duty of reasonable care to Beltran-Serrano. Specifically, the City asserted that (1) a negligence claim could not be based on an intentional tort, (2) the public duty doctrine barred any negligence claim, and (3) a negligent training and supervision claim was unavailable because Officer Volk was acting within the scope of her employment. CP at 240-54. The Pierce County Superior Court granted the City's motion to dismiss the negligence claims and entered an order certifying for interlocutory review the issue of "whether a police officer owes a duty of reasonable care to act reasonably when using deadly force." CP at 698-99, 757.[3] Beltran-Serrano then filed a motion for direct discretionary review in this court, which our commissioner granted pursuant to RAP 4.2(a)(4).[4]

---

[3] The order on summary judgment dismisses "plaintiff's negligence claims . . . in their entirety." CP at 699. However, the separate certification order framing the issue for review does not reference the negligence claims based on the City's duty to train and supervise employees. CP at 757. Beltran-Serrano's motion for discretionary review is similarly limited to this focus. *See* Mot. for Discr. Review at 1. Given the limited issue identified in the certification order and the motion for discretionary review, we have not separately addressed Beltran-Serrano's negligence theory based on the City's training and supervision of its employees. We leave it to the superior court on remand to determine, consistent with the reasoning in this opinion, whether that negligence theory remains for trial.

[4] The City separately sought discretionary review in the Court of Appeals of an order granting partial summary judgment to Beltran-Serrano concerning the reasonableness of medical expenses. That matter has been stayed pending this review.

ANALYSIS

Claims of negligent law enforcement are not novel. Washington courts have long recognized the potential for tort liability based on the negligent performance of law enforcement activities. *See, e.g.*, *Washburn v. City of Federal Way*, 178 Wn.2d 732, 310 P.3d 1275 (2013) (negligent service of a protective order); *Chambers-Castanes v. King County*, 100 Wn.2d 275, 669 P.2d 451 (1983) (negligent failure to respond with police assistance in a timely manner); *Mason v. Bitton*, 85 Wn.2d 321, 534 P.2d 1360 (1975) (negligent police vehicle chase); *Garnett v. City of Bellevue*, 59 Wn. App. 281, 796 P.2d 782 (1990) (negligent infliction of emotional distress for officers' harsh and offensive language in responding to a call that plaintiffs were loitering). Indeed, the City readily acknowledges that such liability is consistent with the broad waiver of sovereign immunity for municipalities under RCW 4.96.010. Br. of Resp't at 10.

The question in this case is whether a claim of negligence can be based on Officer Volk's shooting of Beltran-Serrano when it is clear the shooting was intentional, i.e., volitional. The City insists that "[t]here is no such thing as the negligent commission of an intentional tort." *Id.* at 18. The City further argues that the public duty doctrine precludes liability because the statutory duty "to enforce the laws and keep the peace . . . is imposed solely on government and owed to the public

at large." *Id.* at 36. We believe the City misunderstands both the nature of Beltran-Serrano's negligence claim and the nature of its law enforcement duty.

### A. An Intentional Tort Claim Does Not Foreclose a Negligence Claim Premised on the Failure To Use Reasonable Care To Avoid the Use of Force

In arguing that Beltran-Serrano seeks to allege negligence in the commission of an intentional tort, the City fails to appreciate the nature of Beltran-Serrano's claim. The core of his negligence claim is that Officer Volk unreasonably failed to follow police practices calculated to avoid the use of deadly force. CP at 77-78. Beltran-Serrano focuses on Officer Volk's negligence leading up to the shooting, including her failure to respond appropriately to clear signs of mental illness or impairment, her decision to continue to engage with Beltran-Serrano in English, and her decision to prevent him from walking away. The negligence allegations also identify Officer Volk's lack of adequate training and her failure to recognize the ineffectiveness of using a stun gun against a mentally ill individual.[5] While these negligence claims

---

[5] Beltran-Serrano offered testimony from a police practices expert that Officer Volk failed to recognize Beltran-Serrano was affected by mental illness and did not follow basic police procedures. Br. of Appellants at 10-11; *see* CP at 473-81. In her deposition, Officer Volk stated that she perceived no basis to determine whether Beltran-Serrano was mentally ill. CP at 475. Beltran-Serrano's expert reviewed Officer Volk's training records and found her last course completed on mental health was in February 2013. *Id.* Officer Volk was unable to recall any training that addressed how to approach someone suffering from mental illness. CP at 476. Beltran-Serrano also presented the testimony of Volk's fellow officer Loretta Cool, who explained that upon approaching the same situation as Officer Volk, she would have considered the person to have been under the influence of drugs or mentally ill. CP at 494.

relate to events that culminated in Officer Volk intentionally shooting Beltran-Serrano, they do not assert a "negligent intentional shooting." Instead, they require consideration of the totality of the circumstances involved in the encounter between Officer Volk and Beltran-Serrano, and identify potential negligence in the series of actions leading up to the decision to shoot.

The District of Columbia Court of Appeals has considered cases similar to this one and has explained the distinction between negligence and intentional tort claims arising from police use of force. *District of Columbia v. Chinn*, 839 A.2d 701, 710 (D.C. 2003). The court observed, "'[W]here there is sufficient evidence to submit to a jury the question of assault and battery, there may be, on the facts of a particular case, sufficient evidence to submit the question of negligence as well.'" *Id.* (alteration in original) (quoting *Holder v. District of Columbia*, 700 A.2d 738, 742 (D.C. 1997)). Cases allowing for both claims present a set of common characteristics:

> Each involves the use of deadly force. Each invokes a police regulation establishing a standard of care with respect thereto that is arguably distinct from the excessive force standard. Each involves alternate scenarios in at least one of which a distinct act of negligence, a misperception of fact, may have played a part in the decision to fire. Each involves a negligent act that precedes the application of the relevant force of resort to firearms, i.e., prior to the pulling of the trigger.

*Id.* at 710-11. These characteristics underscore how ordinary negligence principles apply in situations that involve both a claim of battery or unprivileged use of force

*and* the duty to act reasonably in carrying out law enforcement functions. The series of actions culminating in the use of deadly force may be analyzed in its constituent parts or, alternatively, as involving either negligent or intentional conduct. *Id.*; *see also Hayes v. County of San Diego*, 57 Cal. 4th 622, 626, 305 P.3d 252, 160 Cal. Rptr. 3d 684 (2013) (recognizing negligence claim may be asserted for police use of deadly force "if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable").[6]

To understand how negligent acts leading up to the ultimate use of force may be delineated from the use of force itself, one need consider only a variation on the facts of this case. A person in Beltran-Serrano's situation might just as readily be injured, not by an officer shooting, but perhaps by running into a car as he attempts to flee from the officer in panic. The same acts of negligence remain under either

---

[6] The federal district court cases the City relies on miss this overlap between negligence and battery. *See Roufa v. Constantine*, No. C15-1379JLR, 2017 WL 120601 (W.D. Wash. Jan. 11, 2017) (court order); *Lawson v. City of Seattle*, No. C12-1994-MAT, 2014 WL 1593350 (W.D. Wash. Apr. 21, 2014) (court order); *Willard v. City of Everett*, No. C12-14 TSZ, 2013 WL 4759064 (W.D. Wash. Sept. 4, 2013) (court order), *aff'd*, 637 F. App'x 441 (2016). These cases posit a negligence claim based on the unreasonable use of force or an unlawful arrest. This does not accurately describe the negligence Beltran-Serrano alleges. As noted, his negligence claim is premised on Officer Volk's failure to understand and apply accepted police procedures in dealing with a mentally ill individual who has limited English language proficiency, and in avoiding the use of force. The gravamen of the negligence claim is the mishandling of the encounter, not the use of excessive force.

scenario, but we would not describe the latter scenario as involving an intentional tort. By focusing on the alleged acts of negligence during the totality of Officer Volk's encounter with Beltran-Serrano, we avoid mischaracterizing this case as involving "nothing but" an intentional tort.

Our analysis also accords with the practice in Washington of allowing claims to be pursued under alternative, even inconsistent, theories of recovery. CR 8(e)(2) (specifying that a party may plead "as many separate claims or defenses as the party has regardless of consistency"). Here, the fact that Beltran-Serrano may have a valid intentional tort claim for excessive force has no bearing on the viability of his negligence claim for violation of the duty to act reasonably. A jury could find one claim or the other (or neither claim) to be supported. The City certainly has not *conceded* that Beltran-Serrano has an assault and battery claim as opposed to a negligence claim. All claims remain for trial.

The City misreads *Boyles v. City of Kennewick*, 62 Wn. App. 174, 813 P.2d 178 (1991), as precluding overlapping claims of negligence and assault and battery under Washington law. *See* Br. of Resp't at 9, 22; Resp. to Mot. for Discr. Review at 12. *Boyles* merely explains that a police officer may be an intentional tortfeasor and "is liable as such *for assault and battery* if unnecessary violence or excessive force is used in accomplishing the arrest." *Boyles*, 62 Wn. App. at 176 (citing 6A C.J.S. *Assault & Battery* § 27 (1975)). This statement alone, however, does not

support the City's argument because it does not foreclose a separate claim premised on negligence. The authority cited in *Boyles* for the above statement is a *Corpus Juris Secundum* entry describing claims for assault and battery. Not only does *Boyles* fail to limit actions against law enforcement to intentional torts, it specifically states that a claim for negligence against a police officer remains possible:

> As Ms. Boyles points out, there are no Washington cases mandating a claim of assault and battery for all injuries inflicted during or after an arrest. *While a claim for negligence against a police officer is possible,* it is not raised by the factual allegations of the complaint in this case and, therefore, does not relate back to the original pleadings; additional facts would be necessary to support it.

*Id.* at 178 (emphasis added). Here, Beltran-Serrano's amended complaint asserted a valid claim of negligence and alleged facts necessary to support it. CP at 73-79. Consistent with Washington case law and CR 8(e)(2), Beltran-Serrano is allowed to pursue both an intentional tort and a negligence action.

The City further argues that allowing a negligence action based on police use of force would "circumvent both the defense of self-defense and the standard of objective reasonableness applicable to an excessive force claim." Br. of Resp't at 23. We disagree. The statute the City relies on, RCW 9A.16.040, governs "[j]ustifiable homicide or use of deadly force by public officer, peace officer, [or] person aiding." (Boldface omitted.) This statute defines when police officers are justified in using deadly force. *See id.* Regardless of whether Beltran-Serrano's

claims sound in negligence or assault and battery, the statute allows Officer Volk to argue to the jury that her actions were privileged under the good faith standard of the statute that requires consideration of "all the facts, circumstances, and information known to the officer at the time." RCW 9A.16.040(4). This statutory standard fully accords with Beltran-Serrano's view that the facts of this case must be evaluated under the totality of the circumstances, including Officer Volk's preshooting conduct. Br. of Appellants at 27-28.

We hold that Beltran-Serrano's intentional tort and negligence claims may coexist under the facts of this case. Considering the totality of the circumstances, the allegations support a claim for negligence that does not amount to a "negligent intentional shooting." Moreover, all facts remain to be determined at trial, and negligence and intentional tort claims may be pleaded in the alternative under CR 8(e)(2). The superior court erred in dismissing the negligence claims as a matter of law.

A remaining question is whether Beltran-Serrano's negligence claims should nonetheless be dismissed in light of the public duty doctrine. Stated differently, we must determine whether the duty owed by Officer Volk represents a tort duty owed specifically to Beltran-Serrano rather than a nonactionable duty owed to the public as a whole.

B. Officer Volk Owed a Duty in Tort to Beltran-Serrano Based on Her Affirmative Conduct throughout Their Interaction

The public duty doctrine recognizes that governments, unlike private persons, are tasked with duties that are not actionable duties within the meaning of tort law. *Washburn,* 178 Wn.2d at 753. The central purpose behind the public duty doctrine is to ensure that governments do not bear greater tort liability than private actors. *Munich v. Skagit Emergency Commc'ns Ctr.,* 175 Wn.2d 871, 886, 288 P.3d 328 (2012) (Chambers, J., concurring).

To establish a duty in tort against a governmental entity, a plaintiff must show that the duty breached was owed to an individual and was not merely a general obligation owed to the public. *Babcock,* 144 Wn.2d at 785. While there are four exceptions to the public duty doctrine that provide for liability even in the face of otherwise public duties, *see Munich,* 175 Wn.2d at 879, an enumerated exception is not always necessary to find that a duty is owed to an individual and not to the public at large.[7] Instead, the public duty doctrine is simply a "focusing tool" to ensure that the government is not held liable in tort for duties owed solely to the general public. *Id.* at 878.

---

[7] The four recognized exceptions to the public duty doctrine are (1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) a special relationship. *Munich,* 175 Wn.2d at 879. "If any one of the exceptions applies, the government is held as a matter of law to owe a duty to the plaintiff." *Id.*

Importantly, this court has recognized that the public duty doctrine comes into play when special governmental obligations are imposed by statute or ordinance. *Id.* at 886 (Chambers, J., concurring). As to common law negligence, Justice Chambers pointed out in his concurrence in *Munich* that "[t]his court has never held that a government did not have a *common law* duty solely because of the public duty doctrine." *Id.* at 886-87 (emphasis added).[8] To apply the doctrine so broadly would inappropriately lead to a partial restoration of immunity by carving out an exception to ordinary tort liability for governmental entities. *Id.* at 892 (Chambers, J., concurring). This would undermine the value of tort liability to protect victims, deter dangerous conduct and provide a fair distribution of risk of loss. *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 407, 241 P.3d 1256 (2010) (Chambers, J., concurring).

At common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others. *Restatement (Second) of Torts* § 281 cmt. e (Am. Law Inst. 1965) explains that "the duty established by law to refrain from the negligent conduct is established in order to protect the other from the risk of having his interest invaded by harm resulting from one or more of this

---

[8] Justice Chambers's concurring opinion is precedential because it received five votes from justices who also signed the majority opinion. *See Shizuko Mita v. Guardsmark, LLC*, 182 Wn. App. 76, 83 n.2, 328 P.3d 962 (2014) (recognizing stare decisis effect of Justice Chambers's concurrence in *Munich*).

limited number of hazards." This duty applies in the context of law enforcement and encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance. *See Robb v. City of Seattle*, 176 Wn.2d 427, 295 P.3d 212 (2013); *see also Coffel v. Clallam County*, 47 Wn. App. 397, 403, 735 P.2d 686 (1987) (recognizing that, "if the officers do act, they have a duty to act with reasonable care"). In Washington, this principle dates to at least the 1926 case of *Jahns v. Clark*, which specifically recognized an actionable duty on the part of law enforcement officers exercising deadly force. 138 Wash. 288, 296-97, 244 P. 729 (1926) (holding sheriff and deputies liable on a bond for civil damages arising from an "intentional or negligent shooting").[9]

*Garnett* illustrates how recognizing tort liability for negligent law enforcement activities is consistent with the public duty doctrine. 59 Wn. App. at 287. There, the Court of Appeals identified a law enforcement situation where, even

---

[9] Of course, tort liability for law enforcement activities may be limited by the legislature. Statutes specifically mandate the use of a gross negligence standard for a variety of law enforcement related activities. *See, e.g.*, RCW 71.05.510 (detention of a person suffering from mental illness for more than the allowable number of days); RCW 7.69A.040 (failure to provide notice of rights to a child witness or victim); RCW 9.95.204 (supervision of misdemeanant offenders); RCW 4.24.550 (release of information/ classification level of sex offender information to the public). No statute currently alters the reasonable care standard for law enforcement in the use of deadly force. As noted above, RCW 9A.16.040 imposes a "good faith" standard and provides that the use of deadly force is justifiable when "necessarily used by a peace officer meeting the good faith standard of this section to overcome actual resistance to the execution of the legal process, mandate, or order of a court or officer, or in the discharge of a legal duty." RCW 9A.16.040(1)(b).

though no public duty doctrine exception directly applied, the city was liable for its officers' negligence. *Id.* *Garnett* concerned an interaction between police officers and two women who were allegedly soliciting customers at a Bellevue hotel and refused to leave. *Id.* at 282. During the interaction, the police officers accused the women of being prostitutes, saying things like "'You know what you did and you know what you are,'" and "'I am going to pick you up and take you downtown because we don't want your kind here.'" *Id.* at 284. In addressing the plaintiffs' claims for negligent infliction of emotional distress, the Court of Appeals focused on the fact that harm resulted from the officer's direct contact with the plaintiffs, not the performance of a general public duty of policing. *Id.* at 286. Even though the facts did not fit neatly into a previously identified exception, the Court of Appeals correctly rejected the public duty doctrine as a basis to preclude liability. *Id.* at 286-287.

The present case aligns with the analysis in *Garnett*. As noted, under the common law, "if the officers do act, they have a duty to act with reasonable care." *Coffel*, 47 Wn. App. at 403. Beltran-Serrano's negligence claims arise out of Officer Volk's direct interaction with him, not the breach of a generalized public duty. The City therefore owed Beltran-Serrano a duty in tort to exercise reasonable care. Recognizing such a duty does not open the door to potential tort liability for a city's statutorily imposed obligation to provide police services, enforce the law, and keep

the peace. These statutory duties have always been, and will continue to be, nonactionable duties owed to the public at large. In this case, however, the specific tort duty owed to Beltran-Serrano arises from Officer Volk's affirmative interaction with him. The public duty doctrine does not apply to prevent the City from being found liable in tort.[10]

## CONCLUSION

The superior court wrongly dismissed Beltran-Serrano's negligence claims, which are not foreclosed by his intentional tort claim. Under Washington common law, the City owes a duty to refrain from causing foreseeable harm in the course of law enforcement interactions with individuals. Because the duty at issue in this case, grounded in common law negligence, is owed specifically by Officer Volk to Beltran-Serrano rather than to the public as a whole, the public duty doctrine does not apply. Beltran-Serrano has properly pleaded a separate negligence cause of action and identified genuine issues of material fact regarding Officer Volk's breach of the duty to act reasonably. We reverse the superior court order granting summary

---

[10] Even if we believed it necessary to identify an enumerated exception to the public duty doctrine, Beltran-Serrano persuasively argues that the rescue doctrine exception applies here. The rescue doctrine recognizes that a duty to exercise reasonable care arises when a person undertakes "to render aid to or warn a person in danger." *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 299, 545 P.2d 13 (1975). Here, Officer Volk initiated contact with Beltran-Serrano and sought to educate him about panhandling laws. In the course of their interaction, Officer Volk's unreasonable escalation of the encounter to the use of deadly force significantly increased the risk of harm to Beltran-Serrano.

judgment and remand to the trial court for further proceedings consistent with this opinion.

_Stephens, J._

WE CONCUR:

_Fairhurst, C.J._

_González, J._

_Gordon McCloud, J._

_Yu, J._

No. 95062-8

MADSEN, J. (dissenting)—A Tacoma police officer stopped her patrol car and approached a man at the northwest corner of East 28th Street and Portland Avenue, a location for which police had received complaints about aggressive panhandlers. The encounter quickly escalated until the officer drew her firearm and shot the man. The majority holds that these facts support a claim of negligence, but there is no doubt that the officer acted intentionally when she shot this man and that it was the officer's action of shooting the man that caused the injury for which he now seeks compensation. The majority divorces the first portion of the encounter from the injury and says that the escalation is the injury. But it is not. The man is seeking redress for being shot; he does not identify any independent injury related to the escalating conduct. Rather, the events leading up to the shooting are relevant to support the plaintiffs' claim for assault and battery. For these reasons, as expounded below, I dissent.

This case concerns claims against the city of Tacoma stemming from a police shooting of Cesar Beltran-Serrano, a Spanish-speaking, mentally ill man, on a Tacoma street following a community caretaking contact with Beltran-Serrano by Tacoma Police Officer Michel Volk. The present review addresses the trial court's dismissal on partial summary judgment of a negligence claim against the city stemming from the noted

shooting; at issue is whether Beltran-Serrano's negligence claim may be maintained in light of Officer Volk's intentional shooting of Beltran-Serrano.

As noted, the majority answers that question affirmatively by "focus[ing] on Officer Volk's negligence leading up to the shooting" (majority at 7) and reverses the trial court's grant of summary dismissal of the negligence claim. In the majority's view, "[t]he gravamen of the negligence claim is the mishandling of the encounter, not the use of excessive force." *Id.* at 9 n.6. I disagree. In my view, we cannot so easily parse and ignore the required elements of a negligence claim. In the present circumstance, where intentional injury is the basis of the complaint, a claim of negligence is not available as a matter of law. I begin with the required elements of a negligence claim.

To sustain an actionable negligence claim, a plaintiff must establish four essential elements: duty, breach, proximate cause, and resulting harm. *Pedroza v. Bryant,* 101 Wn.2d 226, 228, 677 P.2d 166 (1984); *Hansen v. Friend,* 118 Wn.2d 476, 479, 824 P.2d 483 (1992); *Kennedy v. Sea-Land Serv., Inc.,* 62 Wn. App. 839, 856, 816 P.2d 75 (1991). "If any of these elements cannot be met as a matter of law, summary judgment for the defendant is proper." *Ranger Ins. Co. v. Pierce County,* 164 Wn.2d 545, 552-53, 192 P.3d 886 (2008). "A defendant as moving party may prevail by showing that there is an absence of evidence to support the plaintiff's case." *Kennedy,* 62 Wn. App. at 856 (citing *Young v. Key Pharm., Inc.,* 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989)).

Critically, the damage or harm must be the proximate result of the breach of duty; merely following subsequently in time is not enough. "Negligence and causation are

independent legal requirements, and a finding of negligence does not automatically imply causation." 65 C.J.S. *Negligence* § 15 at 301 (2010). Further, "[d]amages constitute an essential element of a negligence claim; without damages, a negligence claim fails. Proof of damages, that is, actual injury to the plaintiff, is an essential element of a claim for negligence." *Id.* § 54, at 351 (footnote omitted). "*An allegedly negligent act must cause an injury in order to be actionable.* A plaintiff in a negligence action therefore is required to adduce evidence showing there was *a negligent act* on the part of the defendant and that *such act was the cause of the plaintiff's injury.*" *Id.* at 351-52 (emphasis added) (footnote omitted).

> If the negligent act or omission has resulted in no injury or loss to anyone, it is merely injuria sine damno even though it involved a violation of a statute or ordinance. *Even though injury may have resulted, there is no liability unless such injury was proximately caused by the negligence complained of; the real cause of action in a negligence case is not the negligent act but the injury resulting therefrom,* since to support the action there must be not only the negligent act but a consequential injury, and *the injury is the gravamen of the charge.*

*Id.* at 352 (emphasis added) (footnotes omitted).

Put another way, even if the conduct preceding the injury is substandard, such fact cannot "fill in" for the absence of a proximately caused resulting injury. "An action in negligence is not determined alone from the doing of an act resulting in injury to another. Similarly, a defendant's breach of a duty, standing alone, does not mean that a defendant is negligent." *Id.* § 20, at 305 (footnote omitted). "The essence of negligence is behavior creating an unreasonable danger to others"—it is "relative to the time, place, circumstances, or persons involved"; accordingly, "[n]egligence in the abstract does not

3

support a cause of action." *Id.* § 4, at 280. "To maintain an action in negligence, the plaintiff must assert in the complaint [the noted four elements]. When these elements are present, they together constitute negligence, and the absence of any one of these elements renders the complaint bad or the evidence insufficient." *Id.* § 20, at 305-06 (footnote omitted).

> A negligent or careless act is not necessarily actionable negligence. To constitute actionable negligence, there must be not only a lack of care, but such lack of care must involve a breach of some duty owed to a person who is injured in consequence of such breach. Even though an act or omission may involve a lack of care, it does not necessarily follow that any cause of action arises therefrom since negligence which did not contribute to the damage sustained is negligence, but not actionable negligence, and negligence is not a tort unless it results in the commission of a wrong or in harm to someone.

*Id.* § 11, at 292 (footnotes omitted).

Further, the injury must be cognizable in the negligence context. "The term 'negligence' is synonymous with disregard, heedlessness, inadvertence, inattention oversight and thoughtlessness." *Id.* § 15, at 299-300 (footnotes and most internal quotation marks omitted). "The words 'negligence' and 'intentional' are contradictory; negligence is not synonymous with intentional action." *Id.* § 17, at 302 (footnote omitted); *see also Tegman v. Accident & Med. Investigations, Inc.*, 150 Wn.2d 102, 109-10, 75 P.3d 497 (2003) ("fault" within the meaning of chapter 4.22 RCW, which encompasses liability for negligence, does not include intentional acts or omissions); *State Farm Fire & Cas. Co. v. Justus*, 199 Wn. App. 435, 455, 398 P.3d 1258, *review*

4

*denied*, 189 Wn.2d 1026 (2017) (distinguishing "intentional acts to harm" as "not merely conduct which created an 'unreasonable risk of harm'").

> "Negligence," by definition, is not an intentional tort: it includes only such conduct as creates liability for the reason that it involves risk and not certainty of invading the interest of another, and therefor excludes conduct which creates liability because of the actor's intention to invade a legally protected interest of the person injured.

65 C.J.S. *Negligence* § 17, at 302 n.1.

> [N]egligence excludes the idea of intentional wrong; the absence of an intent or purpose to inflict the injury of which complaint is made is essential to the legal conception of negligence and is an element which distinguishes it from other torts. *Where an intention to inflict the injury exists*, whether that intention is actual or constructive only, *the wrongful act is not negligent* but is one of violence or aggression.

*Id.* § 28, at 313 (emphasis added) (footnotes omitted). Accordingly, "[n]egligence claims and assault and battery claims . . . are mutually exclusive." *Id.* § 15, at 300.

With these requirements in mind, turning to the current case, the majority's focus on Officer Volk's alleged substandard conduct concerning her initial contact with Beltran-Serrano does not cure the absence of a qualifying proximately caused injury. That is, while Beltran-Serrano was indeed injured, there is no dispute that the shooting of Beltran-Serrano by Officer Volk was an *intentional* act. The shooting is the only harm alleged by Beltran-Serrano in his complaint and is pleaded as the basis for both his assault and battery claim and his negligence claim. The amended complaint states, "Defendant [city] . . . unreasonably, unnecessarily, and without provocation shot Cesar Beltran . . . thereby inflicting an assault and battery on Cesar Beltran." Clerk's Papers at 78. The amended complaint further states, "As a direct and proximate result of the

5

breaches, failures, and negligence of Defendant [city], . . . Plaintiff was shot . . . multiple times causing serious injuries." *Id.* Only a single harm is alleged—the shooting. There is no dispute that the shooting was intentional. Officer Volk deliberately drew her service handgun and shot Beltran-Serrano multiple times.[1] There is simply no inadvertence that would support a negligence claim. *See* 65 C.J.S. *Negligence* § 14, at 298 ("A negligent act is an inadvertent act."); *see also Boyles v. City of Kennewick*, 62 Wn. App. 174, 176, 813 P.2d 178 (1991) ("[A] police officer making an arrest is justified in using sufficient force to subdue a prisoner, however [the officer] becomes a tortfeasor and is liable as such for *assault and battery* if unnecessary violence or excessive force is used in accomplishing the arrest." (citing 6A C.J.S. *Assault & Battery* § 27 (1975))). A complaint that refers only to intentional, deliberate conduct does not state a prima facie claim of negligence. "To state a claim for negligence, the underlying complaint must allege facts that support a conclusion that the conduct was negligent." *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 769, 320 P.3d 77 (2013). "'In order to state a cause of action for negligence, it is necessary to allege facts which would warrant a finding that the defendant has committed an unintentional breach of a legal duty, and that such breach was a proximate cause of the harm.'" *Id.* (quoting *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 319, 255 P.2d 360 (1953)).

The majority cites *District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003), and *Hayes v. County of San Diego*, 57 Cal. 4th 622, 305 P.3d 252, 160 Cal. Rptr. 3d 684

---

[1] Whether that shooting was justified will be determined at trial.

6

(2013), as support, but in my view, *Chinn* argues against the availability of a negligence claim here and *Hayes* simply does not convince. In *Chinn*, "the plaintiff failed to make a separate and distinct claim for negligence apart from the battery allegations." 839 A.2d at 711. Chinn's allegations "neither establish[ed] a claim separate and distinct from the alleged battery, nor demonstrate[d] the essential elements of a negligence claim. The allegations [did] not reflect negligence, but rather an intentional tort with a conclusory allegation of negligence." *Id.* The same is true here. The *Chinn* court explained,

> The crux of Chinn's claim is that the officers deliberately inflicted excessive force upon him, and . . . assaulted him without provocation. Chinn did not argue that the officers mistakenly or negligently thought Chinn was armed; Chinn did not allege that the officers misperceived him as a threat. The negligence claim . . . should not have gone to the jury as no separate and distinct cause or theory of negligence was presented before the court.

*Id.* *Chinn* does not support the notion that a negligence claim can be premised upon an intentional tort as the majority advocates here.

In *Hayes*, the California Supreme Court, answering a certified question from the Ninth Circuit Court of Appeals, noted that under California state law, the court had "long recognized that peace officers have a duty to act reasonably when using deadly force." 57 Cal. 4th at 629. The California court explained that in its prior decision in *Grudt v. City of Los Angeles*, 2 Cal. 3d 575, 468 P.2d 825, 86 Cal. Rptr. 465 (1970), it had determined that preshooting circumstances might show that an otherwise reasonable use of deadly force by officers was, in fact, unreasonable. But the circumstances in *Grudt* and *Hayes* are nothing like the case here. In *Grudt*, a police officer in plain clothes,

7

carrying a double-barreled shotgun, approached a car, possibly causing the driver to think he was being robbed or attacked. The driver accelerated the car toward a second plainclothes officer, and then both officers opened fire on the driver, killing him. *See Hayes*, 57 Cal. 4th at 629 (discussing *Grudt*). In *Hayes*, police officers were called to a house and advised that the man inside was potentially suicidal. When the officers entered the house to investigate, the man approached them, holding a knife in his raised hand. Both officers drew their firearms and fired two shots, killing the man. *Id.* at 626.

In my view, *Hayes* does not offer any useful guidance here. It is based on foreign jurisdiction law, and the circumstances in both *Hayes* and *Grudt* are simply too different from the present case to be helpful.[2] More to the point, for the reasons discussed above, I disagree with *Hayes*. While an officer's use of deadly force must be appropriate, "[w]here an intention to inflict the injury exists, whether that intention is actual or constructive only, the wrongful act is not negligent." 65 C.J.S. *Negligence* § 28, at 313. As discussed above, a plaintiff "may not base claims of negligence on alleged intentional actions, such as excessive force or unlawful arrest." *Lawson v. City of Seattle*, No. C12-1994-MAT, 2014 WL 1593350, at *13 (W.D. Wash. Apr. 21, 2014) (court order); *see also St. Michelle v. Robinson*, 52 Wn. App. 309, 315-16, 759 P.2d 467 (1988) (where alleged sexual abuse was intentional, and the resulting emotional distress was also intentionally inflicted as a matter of law, plaintiff cannot state a cause of action for

---

[2] In the present case, Officer Volk was not advised that the man she was approaching was unstable; nor was there any question about Officer Volk's identity since she was driving a marked police cruiser and was in uniform when she approached Beltran-Serrano.

negligent infliction of emotional distress); *Willard v. City of Everett*, No. C12-14 TSZ, 2013 WL 4759064, at *2 (W.D. Wash. Sept. 4, 2013) (court order), *aff'd*, 637 F. App'x 441 (2016) ("A plaintiff may not base a claim of negligence on an intentional act, like the use of excessive force."); *Keates v. City of Vancouver*, 73 Wn. App. 257, 267, 869 P.2d 88 (1994) ("As a general rule, law enforcement activities are not reachable in negligence.").

Finally, I note that affirming the trial court's dismissal of the negligence claim does not leave Beltran-Serrano without a remedy concerning the shooting. As *Boyles* noted, where a police officer is alleged to have used excessive force in accomplishing an arrest, a claim for assault and battery may lie, and Beltran-Serrano has so alleged. *See Boyles*, 62 Wn. App. at 176. However, for the reasons discussed, in my view, a negligence claim based on the intentional shooting that occurred here is simply not available. I would affirm the trial court's dismissal of Beltran-Serrano's negligence claim. Accordingly, I dissent.

No. 95062-8
Madsen, J., dissenting

_____Madsen, J._____

Johnson, J.

Owens, J.

10

No. 95062-8

WIGGINS, J. (concurring in dissent)—I concur in Justice Madsen's dissent that a negligence claim based on the intentional act of shooting a weapon is not available. Dissent at 9. I write separately to emphasize the important distinction in mental states between negligence and intentional tort claims.

As we have repeatedly held, a cause of action in negligence requires a plaintiff to show that a defendant owed a duty of care to the plaintiff, there was a breach of that duty, there was a resulting injury, and there was proximate cause between the breach and the injury. *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991). An intentional tort requires, among other things, proof of intent. For example, an "intentional tort" is "[a] tort committed by someone acting with general or specific intent." BLACK'S LAW DICTIONARY 1717 (10th ed. 2014).

The mental states of intentional torts and negligence are vastly different and exist on a sliding scale:

> If the actor knows that the consequences are certain, or substantially certain, to result from his [or her] act, and still goes ahead, [the actor] is treated by the law as if he [or she] had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence.

RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (AM. LAW INST.1965) (RESTATEMENT).

Negligence conveys the idea of neglect or inadvertence, "as distinguished from

1

premeditation or formed intention." *Adkisson v. City of Seattle*, 42 Wn.2d 676, 682, 258 P.2d 461 (1953).

Thus, an actor cannot be of two minds. He or she may act either negligently, lacking intent to cause harm, or intentionally, intending to cause or aware that harmful consequences are substantially certain to result from an action. RESTATEMENT § 8A. These mental states are mutually exclusive. *Id.* §§ 8A, 282 cmt. d; DAN B. DOBBS ET AL., THE LAW OF TORTS § 31, at 77 (2d ed. 2011) ("Any given act may be intentional or it may be negligent, but it cannot be both. Intent and negligence are regarded as mutually exclusive grounds for liability.").

Here, assuming that Cesar Beltran-Serrano could prove the first three elements in negligence, he cannot prove that the proximate cause of his injuries resulted from a negligent act. The sole cause of Beltran-Serrano's injury was the shooting of Officer Michel Volk's weapon. The officer's decision to pull the trigger was intentional. This fact cannot be used simultaneously as evidence of intention and negligence, as liability under these theories requires distinct and mutually exclusive mental states. *E.g.*, RESTATEMENT § 8A.

The majority's decision combines two mutually exclusive principles of tort law and does not answer the inherent conflict it creates in so doing. A claim is one of either negligence or intention—it cannot be both. If a principled path existed to reconciling these conflicting principles, the majority would have offered such a path. It has not, and this silence is telling.

Accordingly, I respectfully dissent.

2

_____Wiggins, J._____